UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BIG CITY SMALL WORLD
BAKERY CAFÉ, LLC,

                     Plaintiff,                           Case Number 16-12652

v.                                             Honorable David M. Lawson

FRANCIS DAVID CORPORATION
d/b/a ELECTRONIC MERCHANT
SYSTEMS,

                     Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION
## TO DISMISS OR COMPEL ARBITRATION

      The plaintiff alleges in a complaint and amended complaint on behalf of itself and others that

defendant Francis David Corporation, which does business as Electronic Merchant Systems (EMS),

overcharged it for processing credit card transactions. The plaintiff signed a credit card merchant

agreement with EMS that contained an arbitration clause. Before the Court is EMS's motion to

dismiss or compel arbitration. Although the agreement contains a rate schedule governing the

parties' relationship (which the plaintiff contends was exceeded), the plaintiff has gone to great

lengths to distance itself from the merchant agreement, and to argue that the arbitration clause is

unconscionable. Those efforts do not persuade. Therefore, the Court will grant the motion to

dismiss.

I.

      In summarizing the facts below, the Court has looked to the complaint, the amended

complaint, and the admissions and other discovery responses produced by the parties during the

period of limited discovery that the Court allowed to address whether the case must be sent to arbitration.

Most of the basic background facts of the case are undisputed. Plaintiff Big City Small World Café, LLC is a small bakery in Ann Arbor, Michigan, operated by its owner Scott Newell. Defendant EMS is an Ohio corporation that provides credit and debit card transaction processing services to retail merchants like Big City. In March 2012, Big City was approached by an agent of EMS offering its transaction processing services. The agent assured Big City that EMS could lower the bakery's costs for its credit card services. The agent represented that EMS could process transactions for a fee comprised of "Interchange + 0.80% + 10 cents per transaction," which means whatever amount was charged by the underlying card issuer "interchange network" to complete each transaction, plus a fixed 10 cent charge and a variable amount equal to 0.80% of the purchase value. That sounded like a good deal to Newell, so on March 21, 2012 he completed an application and merchant agreement to become a customer of EMS, and he signed that agreement as a principal and authorized representative of the plaintiff.

Although they are at odds about the legal effect of the agreement, the parties do not dispute that the copy of the document attached to the defendant's motion to dismiss is an accurate and complete copy of the merchant agreement that was signed by the plaintiff. The agreement contains the following operative provisions pertinent to this lawsuit.

*First*, and of principal relevance to the present motion, the agreement contains an arbitration clause which reads as follows:

> Except as expressly provided in Section 27, any claim or dispute arising out of or related to this Agreement shall be finally resolved by final and binding arbitration. Whenever a party shall decide to institute arbitration proceedings, it shall give written notice to that effect to the other parties. The party giving such notice shall

refrain from instituting the arbitration proceedings for a period of thirty (30) days following such notice to allow the parties to attempt to resolve the dispute between or among themselves. If the parties are still unable to resolve the dispute, the party giving notice may institute the arbitration proceeding under the rules of the American Arbitration Association ("AAA Rules"). . . . The arbitrator shall have the authority to award any remedy or relief a court of the State of Ohio could order or grant, including, without limitation, specific performance of any obligation created under this Agreement, the awarding of the issuance of an injunction or the imposition of sanctions for abuse or frustration of the arbitration process. Judgment upon the award of the arbitrator may be entered in any court of competent jurisdiction and enforced with full judicial effect thereafter. All fees and expenses of the arbitration shall be borne by the parties equally. However, each party shall bear the expenses of its own counsel, experts, witnesses, and preparation and presentations. The [arbitrator is] authorized to award any party such sums as shall be deemed proper for the time, expense and inconvenience of arbitration, including arbitration fees and attorney fees.

Agreement ¶ 28. Although that provision states that "any claim or dispute arising out of or related to this Agreement" would be resolved by arbitration, the agreement includes a carve-out provision allowing the defendant to resort to litigation in the specific case of an action to collect sums due and unpaid under the agreement:

> Bank and EMS shall have the absolute right to initiate or defend any and all disputes arising from this Agreement with Merchant. . . . In the event of a claim by Bank and/or EMS for the failure of a Merchant to pay any chargebacks, fees, settlement costs, or other amounts due hereunder, Merchant agrees that personal jurisdiction and venue of any such claim shall lie in the federal or state courts of Cuyahoga County, Ohio.

Agreement ¶ 27.

*Second*, the agreement states that its term "shall commence on the acceptance of the Application and this Agreement by Bank and EMS and the issuance of a merchant account identification number to Merchant identifying Merchant for accounting, billing, customer service and related purposes . . . and continue for a minimum of twenty-four (24) months unless earlier terminated in accordance with the provisions of this Agreement." Agreement ¶ 9. The agreement

further states that it "shall be effective only upon acceptance and signature by Bank and EMS," but that "[a]ny application fee paid to Bank or EMS is nonrefundable whether or not Merchant and this Agreement are accepted by Bank and EMS." Agreement at 7. The agreement also states that it "may not be modified in any respect without the express written consent of the Bank." *Ibid.* However, the agreement also states that it represents consent by the merchant, effective upon its execution, for EMS to process credit and debit entries to the merchant's bank account. Agreement at 1 ("MERCHANT hereby authorizes BANK and EMS in accordance with this MERCHANT Agreement to initiate debit/credit entries to MERCHANT's checking account as indicated below. This authority is to remain in full force and effect during the term of this Agreement."). As to any purported "waiver" of its provisions, the agreement states: "Neither the failure nor any delay on the part of Bank or EMS to exercise any right, remedy, power or privilege hereunder shall operate as a waiver nor be construed as an agreement to modify the terms of this Agreement." Agreement ¶ 24.

*Third*, in a section labeled "SCHEDULE OF FEES," the Agreement sets forth, in boilerplate terms modified by handwritten figures that were filled in on certain blanks, the "Interchange + 0.80% + 10 cents per transaction" formula alluded to in the complaint. Agreement at 2. The parties have not pointed to any other document disclosed during the course of the limited discovery which memorialized that schedule of fees.

*Finally*, with respect to choice of law, the agreement states: "This Agreement shall be governed by and constructed in accordance with the laws of the State of Ohio." Agreement ¶ 27.

During the course of the limited discovery allowed by the Court, the plaintiff admitted that "the Merchant Agreement was signed on behalf of Big City by an authorized representative," which was the plaintiff's owner, Scott Newell, and that "the representative who signed the Merchant Agreement is a graduate of the University of Michigan." Neither the bank nor EMS ever signed the agreement. However, it appears that EMS issued a merchant account identification number to Big City. The plaintiff admitted that "beginning in March 2012 and ending in August 2013, Big City submitted credit and debit card transactions to EMS for processing and that EMS processed those transactions," and that "during the referenced time period, [Big City] submitted for processing thousands of card transactions involving tens of thousands of dollars." The plaintiff admitted that "EMS performed processing services on behalf of Big City for approximately eighteen months," and that, during that time, it "received . . . monthly account statements from EMS." The plaintiff asserts that all of its claims concern alleged overcharging in the "imposition of fees" for processing services, but it insists that its claims do not implicate the "quality" of the services rendered.

The plaintiff admitted that between "July 2012 [and] July 2016, Big City entered into other written business or commercial agreements or contracts, for example, a lease or purchase of the business location and agreements or contracts with supplier, manufacturers, and service providers." It also admitted that Big City "processed its credit and debit card transactions with a different processor prior to EMS," and "with a different processor after EMS." The plaintiff admitted that "its representative [Scott Newell] read parts of the document and that its representative had the opportunity to read the remainder if he had a few hours to spare and had obtained a magnifying glass." Near the center of the first page of the agreement (one of the pages that was signed by Newell in two places), is a provision that is printed in bold face and capital letters, where the

agreement states: "MERCHANT ACKNOWLEDGES HAVING READ AND RECEIVED A COPY OF THIS AGREEMENT."

In response to a request to admit that it "could have conferred with legal counsel prior to signing the Merchant Agreement," the plaintiff stated that it "could not have afforded to retain legal counsel prior to signing the Merchant Agreement," but that if "one assumes Big City could have found legal counsel to review the Merchant Agreement and advise Big City for free, then Big City would admit the request."

The plaintiff filed its original complaint as a putative class action on July 15, 2016, which pleaded claims for declaratory relief, breach of contract, and unjust enrichment premised on the alleged overcharging of transaction fees. EMS responded with a motion to dismiss or to stay the case and to compel arbitration, based on the arbitration clause in the merchant agreement. That motion was referred to the assigned magistrate judge for a hearing and a report and recommendation. The plaintiff later filed a motion for leave to amend, which was granted upon the stipulation of the parties. In the same stipulation, the parties also agreed that the motion to dismiss or compel arbitration should be dismissed as moot due to the filing of the amended pleading. The Court subsequently denied the motion to dismiss without prejudice.

The amended complaint omits the breach of contract count and excised nearly all uses of the word "contract" and references to the "merchant agreement" that were in the original. On December 19, 2016, the defendant filed a renewed motion to dismiss addressed to the amended complaint. The Court heard oral argument on the motion on June 28, 2017.

## II.

The defendant brought its motion under Federal Rule of Civil Procedure 12(b)(1), contending that the arbitration clause deprives this Court of jurisdiction to adjudicate the plaintiff's claims. There is some difference of opinion among the federal courts as to the proper procedural avenue for asserting a demand to compel arbitration. As the First Circuit noted in *Cortés-Ramos v. Sony Corporation of America*, 836 F.3d 128 (1st Cir. 2016), there is considerable variation in "how courts characterize dismissal on arbitrability grounds, with some courts treating the dismissal as jurisdictional and thus pursuant to Rule 12(b)(1); other courts treating the dismissal as 'failure to state a claim cognizable in federal court' and thus pursuant to Rule 12(b)(6); and still others treating the dismissal as 'entirely separate from the Rule 12(b) rubric.'" *Id.* at 130. The Sixth Circuit has not weighed in on that issue in a published opinion. However, in an unpublished case, that court has allowed a motion to compel arbitration to proceed under Rule 12(b)(1). *Andrews v. TD Ameritrade, Inc.*, 596 F. App'x 366, 370 (6th Cir. 2014).

However, there are several reasons why efforts to enforce a contractual arbitration clause should not be treated as an attack on the court's subject matter jurisdiction. First, the Supreme Court's rulings on point suggest that an arbitration clause is a form of forum selection clause, and that a motion to compel arbitration is not properly regarded as implicating the subject matter jurisdiction of the federal court. "An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). "When a forum-selection clause points to a state or foreign forum, the clause may be

enforced through the doctrine of *forum non conveniens*." *Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, --- U.S. ---, 134 S. Ct. 568, 574 (2013).

Second, the Sixth Circuit court of appeals itself has warned that attacks on the merits should not be confounded with jurisdictional challenges, admonishing courts to be more exacting when addressing challenges that are phrased as an attack on jurisdiction. *Primax Recoveries, Inc. v. Gunter,* 433 F.3d 515, 518-19 (6th Cir. 2006) ("'Clarity would be facilitated . . . if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'" (quoting *Eberhart v. United States,* 546 U.S. 12, 16 (2005) (per curiam), and citing *Kontrick v. Ryan,* 540 U.S. 443, 453 (2004))). An arbitration clause easily can be characterized as a "claim-processing rule."

Third, under the Federal Arbitration Act, a court retains authority to stay a case pending arbitration and then afterward enter judgment on the award. *See* 9 U.S.C. §§ 3, 9. If an arbitration clause were to oust subject matter jurisdiction, then a court would have no authority to enter judgment.

Finally, the Sixth Circuit holds that a party may waive the right to arbitration by engaging in a course of conduct inconsistent with its reliance on an arbitration agreement or by a lengthy delay in asserting its right to arbitrate. *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012); *see also Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 827-28 (6th Cir. 2015). Waiver of arbitration in a case that otherwise is governed by an arbitration clause amounts to an agreement to confer subject-matter jurisdiction upon a federal court. That idea runs counter to accepted jurisprudence. *See Holman v. Laulo-Rowe Agency*, 994 F.2d 666, 668 n.1 (9th Cir. 1993)

("The parties cannot . . . create federal court subject matter jurisdiction by stipulation"); *American Policyholders v. Nyacol,* 989 F.2d 1256, 1258 (1st Cir. 1993) (holding that the parties "cannot confer subject matter jurisdiction by agreement").

The Court is convinced that the better approach is the one outlined by the Seventh Circuit in *Grasty v. Colorado Tech. Univ.*, 599 F. App'x 596 (7th Cir. 2015):

> As a preliminary matter, an agreement to arbitrate does not affect a district court's subject-matter jurisdiction. An arbitration clause is a type of forum-selection clause. Motions to compel arbitration thus concern venue and are brought properly under Federal Rule of Civil Procedure 12(b)(3), not Rule 12(b)(1). But this misunderstanding did not affect the outcome, since under Rule 12(b)(3) the district court still was free to consider the materials submitted with the university's motion, including the arbitration clause.

*Id.* at 597 (citations omitted). The Court will proceed under that rubric.

### III.

In resisting arbitration, the plaintiff argues that (1) the supposed agreement never was effective because an express condition precedent to its consummation was not satisfied, where the defendant and its bank never signed the agreement, (2) the plaintiff did not waive and is not estopped from disclaiming the agreement as a result of the failed signature condition, (3) at the least, a jury trial is required to resolve the disputed issues of fact about whether an agreement was formed, and (4) even if the agreement was consummated, the arbitration clause should not be enforced against the plaintiff because it is unconscionable, unduly favorable to the defendant, and in practical terms would make it uneconomical for the plaintiff to pursue its claims.

Underlying these contentions is the plaintiff's insistence that the merchant agreement is a nullity. Emphasizing that point, the plaintiff has abandoned its breach of contract claim in the amended complaint, instead choosing to pursue claims for declaratory relief and unjust enrichment.

Without reference to the merchant agreement, however, those claims are adrift. For example, the declaratory relief claim asks the Court to declare at once "that the parties do not have a binding, enforceable contract," Amend. Compl. ¶ 69, and that the defendant "was bound not to raise rates and fees above those set forth in the Schedule of Fees" that was part of the merchant agreement, Amend. Compl. ¶ 70. Without reference to the schedule of fees, there is no basis to determine whether EMS's charges were unreasonable or that it was unjustly enriched. *Cf. Beth Israel Med. Ctr. v. Verizon Bus. Network Servs., Inc.*, No. 11-4509, 2013 WL 1385210, at *4 (S.D.N.Y. Mar. 18, 2013). Absent a contract, the plaintiff has no basis for recovery, or at least not one that the plaintiff has identified. The plaintiff "cannot pick and choose the provisions of the contract which support his version of the facts while ignoring other provisions which do not operate to his benefit." *Boker v. Clyde Cole Motor Co.*, No. 3261, 1983 WL 6042, at *2 (Ohio Ct. App. Dec. 30, 1983). It is in that context that the plaintiff's arguments must be considered.

A.

The parties agree that Ohio law governs their dispute. EMS says this is so because the merchant agreement contains a choice-of-law clause that says Ohio law governs. The plaintiff does not acknowledge that contractual source for applying Ohio, and instead believes that Michigan's choice-of-law rules point to Ohio law as the rules for decision. That point is debatable, but it need not detain the Court. The contractual choice-of-law clause applies and designates Ohio as furnishing the rules for decision in this case.

The plaintiff contends that the agreement is "ineffective" as to its rights, despite the undisputed facts that (1) Newell signed the agreement on March 21, 2012 (in at least three places), and thereafter delivered a signed copy of the agreement to the defendant; and (2) all parties to the

agreement proceeded to perform (more or less) according to its terms for more than a year and a half. The plaintiff believes that, notwithstanding its undisputed endorsement of the agreement and the extended performance of all parties according to it, the agreement was somehow rendered void some five years after it was initiated, upon the plaintiff's discovery that the document never was counter-signed by any representative of the defendant or its processing bank. That position is not sustainable.

Under Ohio law, the requisites for formation of an enforceable contract are "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 41 N.E.3d 145, 151 (Ohio Ct. App. 2015). The only elements seriously in dispute here are "acceptance" and "mutual assent." The defendant's acceptance of the terms is amply and certainly established by its 18 months of performance according to those terms. *Motorists Mut. Ins. Co. v. Columbus Fin., Inc.*, 2006-Ohio-5090, ¶ 8, 861 N.E.2d 605, 609 (Ohio Ct. App. 2006) ("[C]onduct sufficient to show agreement, including performance, constitutes acceptance."). And, although the parties obviously disagree about the propriety of some of the fees charged by the defendant, the plaintiff insists that it has no complaints about the "quality" of the service rendered by the defendant as described in the agreement.

Similarly, the mutual assent of the parties was shown when the plaintiff's representative, after having the opportunity to review the agreement, accepted the defendant's solicitation, executed the merchant agreement, and delivered it to the defendant. "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract," and it "occurs if a reasonable person would find that the parties manifested a present intention to be bound to an

agreement." *PNC Bank*, 41 N.E.3d at 151. "Whether there has been a manifestation of mutual assent and/or a meeting of the minds is a question of fact to be determined from all the relevant facts and circumstances." *Costner Consulting Co. v. U.S. Bancorp*, 960 N.E.2d 1005, 1010 (Ohio Ct. App. 2011). But any reasonable observer here would be bound to conclude on the facts in this record that the plaintiff intended to be bound by the agreement: the plaintiff has admitted that Newell signed the agreement, which states that, by signing it, the "MERCHANT hereby authorizes BANK and EMS in accordance with this MERCHANT Agreement to initiate debit/credit entries to MERCHANT's checking account as indicated below," and that "[t]his authority is to remain in full force and effect during the term of this Agreement"; and the agreement described in detail the services to be provided, the term for which the agreement was to be effective, and the rates to be charged for the services rendered. A trial is not necessary to establish the point.

The plaintiff's assent to the terms of the agreement may be inferred from Newell's execution of it, notwithstanding any anticipation by the parties that the agreement formally would be counter-signed at some later time. *PNC Bank*, 41 N.E.3d at 152-53 ("Wright signed the written mediation agreement, and we must conclude that he intended to be bound by the terms as expressed at that time, despite the agreement's statement that a more formal legal document could be prepared."); *see also Gervace v. Master Foods, Inc.*, No. 37643, 1978 WL 218137, at *6 (Ohio Ct. App. Oct. 12, 1978) ("[The written agreement] was binding on the Gervaces when signed by each of them, not when they received a copy of the [counter-signed] agreement in the mail in January 1973."). And the defendant certainly consented to be bound by the agreement when it proceeded to establish a merchant account for the plaintiff's benefit and to provide transaction processing services for thousands of purchases over the course of 18 months. The plaintiff insists that it "assumed" that the

agreement had been signed, and that it is "customary" for business entities to return a counter-signed copy of a written contract upon acceptance. But "there is no general rule in Ohio that requires a contract to be physically delivered before it is binding on the parties without an agreement to the contrary." *Indus. Heat Treating Co., Inc. v. Indus. Heat Treating Co. Toledo*, 104 Ohio App. 3d 499, 509, 662 N.E.2d 837, 844 (1995). Here, notwithstanding the reservation of acceptance, the agreement does not state anywhere that its effect would be delayed pending receipt of a fully executed document by the plaintiff.

Morever, the plaintiff's entire complaint in this case is premised on the defendant's alleged failure to conform its charges to an agreed "written Schedule of Fees" for processing credit card transactions. The only writing submitted by either party that comprises any such schedule is the section featured on the second page of the written merchant agreement, labeled "SCHEDULE OF FEES" (which appears directly above the signature of the plaintiff's representative, in a section of the agreement that is captioned "AGREED AND ACCEPTED"). Agreement at 2 (Pg ID 534). The plaintiff never had — and does not now have — any question that the *defendant* was bound to abide by the schedule of fees provision of the agreement. As noted earlier, it cannot plausibly maintain that the defendant is bound to the terms of an agreement that it contends never existed. *Boker*, 1983 WL 6042, at *2.

The plaintiff contends that the provision of the agreement stating that it would not be effective until ratified by authorized signatories of the bank and the defendant renders it a nullity from the outset, where it is undisputed that the condition never was satisfied. But it is well accepted under Ohio law "that a party to a contract who would benefit from a condition precedent to its performance may waive that condition." *Thomas v. Nationwide Mut. Ins. Co.*, 520, 895 N.E.2d 217,

231 (Ohio Ct. App. 2008) (quotation marks omitted). Here, the language of the agreement shows that this "condition" was for the benefit of the defendant and its bank, to permit them the opportunity to refuse the application for processing services if an investigation of the applicant's business reputation, revenue stream, and credit history gave cause for concern. In fact, on the first page of the agreement, in a section printed in bold face type and capital letters, the agreement states that acceptance was reserved precisely for that purpose:

> AN INVESTIGATIVE CONSUMER REPORT MAY BE MADE IN CONNECTION WITH THE ATTACHED APPLICATION. MERCHANT AUTHORIZES BANK, EMS OR ANY CREDIT REPORTING AGENCY EMPLOYED BY BANK OR EMS TO INVESTIGATE THE REFERENCES GIVEN OR ANY OTHER STATEMENTS OR DATA OBTAINED FROM MERCHANT, OR ANY OF THE UNDERSIGNED PRINCIPALS, FOR THE PURPOSE OF THIS APPLICATION OR ANY APPLICATION FOR ACCOMPANYING POS EQUIPMENT FINANCING. THE ABOVE SCHEDULE OF FEES IS PREDICATED ON THE BUSINESS PROFILE AND THE FOLLOWING INFORMATION:
>
> AVERAGE MONTHLY SALES VOLUME: $ _____ AVERAGE TICKET SIZE: $ _____ HIGHEST TICKET SIZE: $ _____
> . . .
> MERCHANT ACKNOWLEDGES HAVING READ AND RECEIVED A COPY OF THIS AGREEMENT, AND THAT IT SHALL NOT BE EFFECTIVE UNTIL APPROVED BY BANK AND EMS.

Agreement at 2 (Pg ID 534) (handwritten figures omitted).

Waiver of a contractual condition "may be made by express words or by conduct which renders impossible a performance by the other party, or which seems to dispense with complete performance at a time when the obligor might fully perform." *White Co. v. Canton Transp. Co.*, 2 N.E.2d 501, 505 (Ohio 1936). In this case, the defendant's decision to perform the agreement without hesitation for more than a year and a half certainly establishes its election to forgo insistence on strict compliance with the signature condition.

However, even if the supposed "condition" is construed as being for the benefit of both parties, or the plaintiff alone, the plaintiff has failed to explain any way in which its performance was impaired or influenced by the failure of the defendant or its processing bank to counter-sign the agreement. It has failed to establish, therefore, that the parties intended the absence of a formal endorsement to foreclose acceptance or performance of the agreement. "Conditions precedent are not favored by the law," and "[w]henever possible, [Ohio] courts avoid construing provisions to be such unless the intent of the agreement is plainly to the contrary." *Coldwell v. Moore*, --- N.E.3d ---, 2017 WL 606420, at *8 (Ohio Ct. App. Feb. 14, 2017). The facts of this case contrast with those where Ohio courts have found an absence of acceptance based on a failure by a party formally to sign a contract document. For instance, in *Denton v. Pittsburgh Plate Glass Co.*, 2 Ohio Law Abs. 138 (Ohio Ct. App. 1923), the Ohio Court of Appeals found that a subcontractor was not bound to a contract where it had submitted to the architect plaintiff a signed bid and contract to build, but the architect delayed for months before it purported to "accept" the bid by returning a counter-signed copy of it. As a result of the delay, the cost of materials needed for the project had risen sharply. Moreover, the architect had not responded to numerous inquiries by the contractor about the status of the bid. The court concluded that the contractor was not bound to perform because, "it was the intention of the parties that the contract was to be reduced to writing," but the counter-party "did not sign the contract or accept the offer *within a reasonable length of time after the agreement had been signed by the defendant*." *Id.* at 138 (emphasis added). Here, it is undisputed that there was no delay in the commencement of performance by any party under the agreement due to any supposed suspense about whether acceptance had occurred, and the plaintiff has not suggested any way in

which any party's performance was compromised by the absence of any counter-signatures on the contract document.

In all events, regardless of what the plaintiff believed about the signature condition, it is undisputed that the plaintiff never attempted to exercise any supposed rights under that provision, and it never asked the defendant to return a counter-signed copy of the document. In response to a request to admit "that Big City could have requested from EMS a fully signed copy of the Merchant Agreement at any time after March 22, 2012," the plaintiff responded: "To the extent it is possible to request a document that indisputably does not exist, Plaintiff admits the request." Plf.'s Supp. Resps. to Reqs. to Admit ¶ 17 (Pg ID 1020). The plaintiff's evasive response to that discovery request suggests, at the least, that it never had any real concern about the absence of a counter-signature until the defendant asserted its right to compel arbitration, whereupon the plaintiff suddenly seized upon the position that the agreement was void for want of a signature, notwithstanding the parties' extensive and mutual completed performance.

Finally, the plaintiff asserts that the entire agreement is "illusory" for want of mutual consideration, because the agreement reserved to the defendant the right to alter its terms at any time, and EMS therefore made no definitive promise to do anything for the plaintiff that it could not later opt out of doing at its whim by modifying the agreement. That argument is without merit, because the modification clause of the contract specifies that the defendant could change the terms or pricing of the agreement only upon written notice to the plaintiff, and, upon receiving that notice, the plaintiff would have an unqualified right to terminate the agreement without penalty, by simply providing a notice of termination before the stated effective date of the changes. Agreement ¶ 30 (Pg ID 538). "[T]he concept of 'mutuality of obligation' expresses the idea that 'both parties to the

contract must be bound or neither is bound.'" *Helle v. Landmark, Inc.*, 472 N.E.2d 765, 776 (Ohio Ct. App. 1984). The agreement here provides exactly that; as long as the terms of the agreement stood unchanged, both parties were bound, but if the terms were changed by the defendant, then neither would be bound, and the plaintiff could end the arrangement as freely as the defendant could alter it. In all other respects the agreement certainly was supported by ample mutual consideration, where it specified in detail the services to be provided and the payments to be rendered in return for them.

The merchant agreement was complete and effective between the parties.

B.

The plaintiff contends that the arbitration clause cannot be enforced because its terms are "unconscionable." However, it has failed to point to anything about those terms, or the circumstances under which they were negotiated, to establish that the agreement is unenforceable under the principles of Ohio contract law. To invalidate an arbitration clause on the ground of unconscionability, the plaintiff must establish that it is both "procedurally" and "substantively" unsound. *Love v. Crestmont Cadillac*, --- N.E.3d ---, 2017 WL 1507321, at *2 (Ohio Ct. App. Apr. 27, 2017); *see also Gaither v. Wall & Assocs., Inc.*, --- N.E.3d ---, 2017 WL 837073, at *5 (Ohio Ct. App. Mar. 3, 2017) ("Because both procedural and substantive unconscionability must be shown, [the appellant's] argument fails on the lack of procedural unconscionability alone."). Here, the plaintiff has not pointed to any facts alleged in the pleadings or revealed in discovery to support either premise.

The plaintiff contends that the circumstances under which the agreement was signed establish procedural unconscionability because (1) the agreement is adhesive in nature, since the

defendant was in a superior bargaining position and offered the contract on a "take it or leave it basis," and the arbitration clause was not subject to meaningful negotiation; and (2) the arbitration clause was "buried" in pages of fine print and was not called out or explained to the plaintiff's representative before he signed the agreement.

The plaintiff's contention that its owner helplessly was duped into agreeing to the arbitration provision is belied by the record developed during the parties' initial discovery. The plaintiff admits that Newell is a college-educated business owner who has executed numerous written contracts for goods and services with other commercial entities. It concedes that Newell had an opportunity to read the entire agreement if he so chose, although it contends that he chose not to, or that he only read "some" of the provisions. The plaintiff also conceded that Newell had an opportunity to have the agreement reviewed by legal counsel before signing it, and he has not pointed to any circumstances that prevented him from doing so, other than the cost of obtaining legal advice, which he evidently preferred not to incur.

The plaintiff's position that Newell was unaware of the arbitration clause is implausible in light of the express representation, stated in bold face on the second page of the agreement, directly over Newell's signature, whereby he acknowledged receipt of a copy of the agreement and represented that he had read it. Agreement at 2 (Pg ID 534) ("MERCHANT ACKNOWLEDGES HAVING READ AND RECEIVED A COPY OF THIS AGREEMENT."). Moreover, the arbitration clause itself appears on the same concluding page of the agreement as a second signature by Newell. Agreement ¶ 28 ("Arbitration") (Pg ID 538). The plaintiff contends that the arbitration clause was "buried" in fine print. It is true that the type face used is small, but it is the same size and type of font used throughout the entire agreement, including in numerous other provisions which

the plaintiff insists it was well aware of and relied upon, such as those stating that the agreement would not take effect until it was approved by the bank. The provision was set forth in a separately numbered paragraph labeled "Arbitration," it clearly stated that all disputes under the agreement would be submitted to binding arbitration, and it described the procedures and cost sharing principles that would apply. Nothing in the text of the agreement suggests that the arbitration clause was unreasonably obfuscated compared with any other terms of the agreement.

The plaintiff also has failed to establish any basis for a conclusion that the terms of the arbitration clause were substantively unconscionable. Under Ohio law, an arbitration clause is valid as long as its terms are commercially reasonable, meaning that the clause clearly explains that disputes will be submitted to arbitration, and states the rules that will govern the arbitration. Remarkably, the facts in this case uncannily track those in *Love v. Crestmont Cadillac*. *See* 2017 WL 1507321, at *3. Considering a similar clause in the that case, the Ohio Court of Appeals observed:

> The arbitration agreement was in a separate document clearly identified as "AGREEMENT TO BINDING ARBITRATION," and it provided that the purchaser agreed to voluntarily "waive any right to a trial in any state or federal court to resolve any dispute and will submit any dispute to binding arbitration." The agreement contained clear language that specifically informed the parties that the arbitration would be conducted by the AAA in accordance with the AAA rules and procedures, and included a website and phone number for obtaining additional information. Because the arbitration agreement provided detailed information about how disputes would be resolved, it was not substantively unconscionable. Also, the Ohio Supreme Court has held that a failure to disclose the costs of arbitration does not make the arbitration provision per se unconscionable. The terms of the arbitration agreement are commercially reasonable.

*Love*, 2017 WL 1507321, at *4 (collecting cases).

In this case, although the arbitration agreement was not in a separate document, it was set forth in a separately numbered and labeled paragraph, and it certainly was within Newell's purview

where it appeared on the same page as his signature executing the agreement. The clause clearly explained that all disputes arising under the agreement would be submitted to arbitration that would be "final" and "binding," that the arbitration would be carried out under the AAA rules, and that the cost of the proceeding would be shared by the parties. The clause also explained the process for initiating an arbitration proceeding, including the 30-day notice provision. Because the terms of the arbitration clause are clearly set forth and disclosed all of the applicable rules for resolving disputes, the clause was "commercially reasonable" and may not be avoided on the ground of unconscionability.

Finally, the plaintiff also contends that the agreement to arbitrate is invalid because it strips the plaintiff of its right to pursue a class action in arbitration, which means that its likely nominal recovery on an individual claim for excessive fees would be outstripped by the cost of an arbitration proceeding. However, that argument was foreclosed by the Supreme Court's ruling in *American Express Co. v. Italian Colors Restaurant*, where the Court held that an arbitration clause that included a "contractual waiver of class arbitration is enforceable under the Federal Arbitration Act [despite the fact that] the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery." --- U.S. ---, 133 S. Ct. 2304, 2307 (2013). As the Court explained, the "class-action waiver merely limits arbitration to the two contracting parties," and it "no more eliminates those parties' right to pursue their [claims] than did federal law before its adoption of the class action for legal relief in 1938." *Id.* at 2311; *see also Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 600 (6th Cir. 2013) ("The idea that the arbitration agreement in this case reflects the intent of anyone but LexisNexis is the purest legal fiction. But all of these things — the one-sided nature of the arbitration clause, and its adhesive nature — were also present in [*Italian*

*Colors*]. And there the Supreme Court held that, all of those concerns notwithstanding, the absence of a class-action right does not render an arbitration agreement unenforceable.").

The adhesive nature of the relationship is a source of concern. It is unlikely that the plaintiff could find an agreement with any merchant acquirer that does not contain an arbitration clause. Such is the case with many financial service providers such as banks, brokers, credit card companies, and other lenders. If a consumer wants to deal with these institutions (or obtain such services at all), he or she must relinquish access to a court to resolve disputes (take it) or forgo the service (leave it). But until Congress or appellate courts recognize that reality, the law remains that "courts must 'rigorously enforce' arbitration agreements according to their terms, including terms that 'specify *with whom* [the parties] choose to arbitrate their disputes,' and 'the rules under which that arbitration will be conducted.'" *Italian Colors*, 133 S. Ct. at 2309 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010); *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). Unconscionability cannot be based simply on the fact that arbitration clauses have become an immutable fixture of financial services contracts. *See Kindred Nursing Centers Ltd. Partnership v. Clark*, --- U.S. ---. 137 S. Ct. 1421, 1426 (2017) ("A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'") (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

## IV.

The arbitration clause in the merchant agreement in this case is valid and enforceable. The plaintiff must pursue its overcharge dispute against EMS in an arbitral forum. Although the Court

may stay this case under section 3 of the Federal Arbitration Act pending the outcome of arbitration, "litigation in which all claims are referred to arbitration may be dismissed." *Hensel v. Cargill, Inc.*, 198 F.3d 245, 1999 WL 993775, at *4 (6th Cir. 1999) (unpublished table decision); *see also Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.").

Accordingly, it is **ORDERED** that the defendant's motion to dismiss or compel arbitration [dkt. #29] is **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITHOUT PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 11, 2017

<table>
<tr><td align="center">**PROOF OF SERVICE**</td></tr>
<tr><td>The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 11, 2017.</td></tr>
<tr><td align="center">s/Susan Pinkowski<br>SUSAN PINKOWSKI</td></tr>
</table>